NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**DEBRA JONES, INDIVIDUALLY, AS NATURAL PARENT OF TODD R. MURRAY, AND AS PERSONAL REPRESENTATIVE OF ESTATE OF TODD R. MURRAY, ESTATE OF ARDEN C. POST, AS SUCCESSOR TO CLAIMS OF ARDEN C. POST, INDIVIDUALLY, AS NATURAL PARENT OF TODD R. MURRAY,**
*Plaintiffs-Appellants*

**UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2024-2053

———————————

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00227-RAH, Judge Richard A. Hertling.

———————————

Decided: April 24, 2026

———————————

JEFFREY S. RASMUSSEN, Patterson Earnhart Real Bird & Wilson LLP, Louisville, CO, argued for plaintiffs-appellants. Also represented by JEREMY JOSEPH PATTERSON.

THEKLA HANSEN-YOUNG, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TODD KIM.

————————————

Before LOURIE, DYK, and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In April 2007, Todd Murray, a member of the Ute Indian Tribe, died from a gunshot to his head on the Uintah and Ouray Reservation (Reservation). Since then, Mr. Murray's parents, Ms. Debra Jones and Mr. Arden C. Post (collectively, the Murray Family), have pressed cases arising from the incident. In the present case, the Murray Family seeks damages from the United States (government) under Article VI of the 1868 Treaty with the Ute Indians, alleging that a particular local police officer shot Mr. Murray. Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619, 620. The case has been to this court twice before, *see Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017) (*Jones II*); *Jones v. United States*, No. 2020-2182, 2022 WL 473032 (Fed. Cir. Feb. 16, 2022) (*Jones V*), and has come to focus on whether Mr. Murray shot himself (as the government contends) or the identified police officer shot him (as the Murray Family contends).

In our 2022 ruling, we concluded that the government must be appropriately sanctioned for spoliating evidence by its (court-approved) destruction of one of the two relevant handguns on the scene—the Hi-Point handgun, found near Mr. Murray's body—and we remanded to the United States Court of Federal Claims (Claims Court) to fashion an appropriate sanction for that spoliation; and we also

remanded for the Claims Court to decide whether the government had spoliated evidence by not taking into custody the other relevant handgun, a Glock possessed by the identified local police officer at the scene, or that officer's clothing. *Jones V*, at \*9, 11. On remand, the Claims Court fashioned a sanction relating to the Hi-Point and held that no spoliation occurred with regard to the Glock or clothing. *Jones v. United States*, No. 13-227, 2023 WL 2681819 (Fed. Cl. Mar. 29, 2023) (*Jones VI*). The Claims Court then held a trial, and after the trial, the court found in favor of the government on the liability question, finding that the Murray Family failed to establish by a preponderance of the evidence that the police officer shot Mr. Murray. *Jones v. United States*, 171 Fed. Cl. 576 (2024) (*Jones VII*). The Murray Family appeals. We now affirm.

## I

### A

The evidence recited by the Claims Court in its ultimate findings supports the following account of what occurred on April 1, 2007.

On that day, a Utah state trooper engaged in a high-speed chase of a vehicle, in which Mr. Murray (wearing a blue shirt) was a passenger, that led into the Reservation. *Jones VII*, at 584–87. The chase ended in a car crash, and Mr. Murray fled the scene on foot. *Id.* at 587. The trooper requested reinforcements, and, as relevant here, Officer Norton, Trooper Young, and Deputy Byron assisted in the search for Mr. Murray. *Id.* at 588. These non-federal officers were not federally deputized to perform law-enforcement activities on the Reservation. S. Appx. 46.[1] At the time, Officer Norton, who worked for the Vernal City, Utah Police Department, was off duty, was wearing a

---

[1] "S. Appx." refers to the government's supplemental appendix.

blue shirt, and could communicate with the police communication hub (so-called dispatch) through his personal cellphone. *Jones VII*, at 585, 588.

At some time between 11:23 and 11:24 a.m., Officer Norton conferred with Trooper Young, and Deputy Byron saw Officer Norton proceed on foot, alone, to try to find and catch up with Mr. Murray. *Jones VII*, at 600. At 11:25 a.m., Deputy Byron and Trooper Young spotted Officer Norton on a hill. *Id.* At 11:26 a.m., Deputy Byron reported seeing a "runner on foot in blue" via his radio. *Id.* at 592–95. Trooper Young replied that "[t]he blue is probably going to be the passenger," referring to Mr. Murray. *Id.* at 593. The shooting occurred within a ninety-second period during the next two minutes. *Id.* at 596. Nobody but Mr. Murray and Officer Norton witnessed the shooting. S. Appx. 49.

Officer Norton testified that, upon cresting the hill (mentioned by Deputy Byron and Trooper Young), he saw Mr. Murray approximately 120 to 130 yards away from him. *Jones VII*, at 598. Officer Norton ordered Mr. Murray to drop to the ground and drew his gun because he thought he saw something black in Mr. Murray's hand. *Id.* Mr. Murray ran toward Officer Norton, firing two shots at him—one of which hit the ground near Officer Norton's feet. *Id.* Officer Norton returned fire twice using his Glock; the bullets did not hit Mr. Murray, and the casings were later found 113 yards from Mr. Murray's body. *Id.* at 597–98, 601. Officer Norton then retreated further up the hill and attempted to call the dispatch system used by the non-federal officers. *Id.* at 598–99. During that time, Mr. Murray, who was right-handed, allegedly placed the Hi-Point, a handgun, to the left side of his head and pulled the trigger. *Id.* at 609, 616; S. Appx. 107.

At 11:27 a.m., Officer Norton informed dispatch of the shooting. *Jones VII*, at 599–600. Around 11:29–11:31 a.m., Trooper Young and Deputy Byron joined Officer Norton at

an area near where the car crash occurred, then Trooper Young and Deputy Byron proceeded, without Officer Norton, to where Mr. Murray lay on the ground. *Id.* at 601. An ambulance took Mr. Murray to a hospital, where he died soon after arriving. *Id.* at 604, 607.

A medical examiner conducted an external physical examination of Mr. Murray and determined that the handgun producing the shot to the head was close to the skin when discharged. *Id.* at 608. Mr. Murray's death was classified as suicide resulting from a contact gunshot wound to the head. *Id.* at 609.

B

The Federal Bureau of Investigation (FBI) had jurisdiction to investigate the on-Reservation shooting, and an FBI agent arrived at the scene of the shooting after Mr. Murray had been transported to the hospital. *Id.* at 604. The FBI agent reviewed and documented evidence and spoke with the non-federal officers at the scene. *Jones VI*, at \*10–12. That FBI agent retired about a month after the shooting. *Id.* at \*4. A successor FBI agent later testified that, following his review of the evidence, he had found no evidentiary discrepancies in the non-federal officers' descriptions about the incident and never contemplated the possibility of civil litigation because he thought that "this was a clear-cut case" of suicide. *Id.* at \*16.

As to the Hi-Point handgun found near where Mr. Murray lay: The on-the-scene FBI agent took custody of the Hi-Point handgun, but it was never subjected to testing. *Jones VII*, at 605, 616. The FBI did trace the Hi-Point and determined that it had been illegally purchased and given to the driver of the vehicle involved in the chase. *Id.* at 609–10. In 2008, the man identified as the purchaser was criminally convicted in a federal district court, which thereafter ordered forfeiture of the Hi-Point pursuant to standard procedures. The Hi-Point was then destroyed by the U.S. Marshals Service.

As to Officer Norton's Glock: The Chief of Vernal City Police (Police Chief), who was Officer Norton's boss, arrived on the scene after Mr. Murray was transported to the hospital, visually inspected the Glock, took custody of the gun (which belonged to the Vernal City Police Department), held it in his possession for several days, and then returned it to Officer Norton. *Jones VII*, at 606; *Jones VI*, at *9, 34. The Police Chief later testified that the Glock looked "pristine." *Jones VII*, at 606. The FBI never sought custody of the Glock or requested that it be tested, S. Appx. 50–51, and it is unclear what became of that handgun, *Jones VII*, at 606.

As to Officer Norton's clothing: The FBI likewise never took custody of or ordered testing of the clothing that Officer Norton wore during the shooting incident. S. Appx. 51. The FBI agent who arrived onsite the day of the shooting testified that Officer Norton's clothing was "clean and pristine" and that he did not suspect that a physical alteration occurred. *Jones VII*, at 605; *Jones VI*, at *34. A contemporaneous photo of Officer Norton corroborated this description. *Jones VI*, at *10, 34.

C

In 2020, after earlier proceedings that included a trip to this court, *see Jones II*, at 1346, the Claims Court made the following rulings of relevance now. It held that the government had spoliated evidence by destroying the Hi-Point and adopted a particular sanction, while it also held that the government had not spoliated evidence by not taking the Glock (and Officer Norton's clothing) into custody. *Jones v. United States*, 146 Fed. Cl. 726, 735–43 (2020) (*Jones III*). It also granted summary judgment in favor of the government. *Jones v. United States*, 149 Fed. Cl. 335, 340 (2020) (*Jones IV*)). In 2022, on the Murray Family's appeal, we held that a greater sanction was required for the Hi-Point spoliation and a new analysis was required to decide whether there was spoliation involving Officer

Norton's Glock and clothing, and we vacated the rulings on those two matters and also, therefore, the ruling against the Murray Family on the damages claim. *Jones V*, at *4–12. We remanded the case to the Claims Court for further proceedings. *Id.* at *13.

## D

In March 2023, the Claims Court imposed the following sanction for the already-adjudicated spoliation of the Hi-Point handgun:

> 1. A rebuttable adverse inference that the [Hi-Point] did not have Mr. Murray's blood, tissue, fingerprints, or DNA on it. The [government] may rebut this adverse inference only with physical evidence or corroborating testimony from at least one witness other than Officer Norton. If the [government] rebuts this adverse inference, the question of what the [Hi-Point] would have shown will be treated as unknowable.
>
> 2. To prevent circumvention of the first sanction, the [government] may not rely on any secondary evidence as to what may have been found on the [Hi-Point] or secondary evidence concerning the un-ejected . . . shell casing found in the destroyed handgun to support its arguments on the merits that Mr. Murray died by a self-inflicted gunshot wound. The [government] may on the merits [ ] present physical evidence or testimony from witnesses to corroborate Officer Norton's testimony to show that Mr. Murray was in possession of and used the [Hi-Point] on April 1, 2007, and to provide evidence concerning the origin, ownership, and destruction of the weapon.

*Jones VI*, at *21. The Claims Court also determined that the FBI did not spoliate Officer Norton's Glock and clothing. *Id.* at *26–42.

The Claims Court held a trial in November 2023. S. Appx. 702. In May 2024, the court entered extensive findings of fact and ruled that the Murray Family "failed to prove by preponderant evidence that Officer Norton fired the fatal shot or otherwise killed Mr. Murray." *Jones VII*, at 622. The Claims Court found that the government had rebutted the Hi-Point's adverse inference through certain physical evidence (*e.g.*, the locations of bullet casings) and pertinent witnesses' consistent testimony. *Id.* at 610–13. The Claims Court also reasoned that "the most likely explanation for how the [ ] Hi-Point came to be found at the scene is the simplest: Mr. Murray brought the [Hi-Point] himself" given the evidence connecting the handgun to the driver of the vehicle in which he was the passenger. *Id.* at 612–13. Relevantly, the Claims Court reached its merits decision, in part, by relying on the dispatch recording of the "runner on foot in blue" to construct a timeline under which it was highly implausible, if not impossible, for Officer Norton to have taken the actions needed for him to have been the fatal shooter given the evidence. *Id.* at 592–96, 606, 613–18. Thus, the Murray Family was unable to recover damages from the government under the 1868 Treaty with the Ute Indians. The Murray Family timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

The Murray Family presents essentially three challenges on appeal. First, we understand the Murray Family to argue that the spoliation sanction for the Hi-Point, at least as applied, was insufficiently strict. Appellant Opening Br. at 45–46. Second, the Murray Family argues that the Claims Court erred in determining that the FBI did not spoliate Officer Norton's Glock and clothing worn the day of the shooting. *Id.* at 25–28. Finally, the Murray Family urges us to conclude that the Claims Court erred in finding that Officer Norton did not shoot Mr. Murray because the Claims Court considered inadmissible evidence concerning

the Hi-Point's chain of ownership and improperly relied on the dispatch transcript recording the sighting of the "runner on foot in blue" to establish the timeline of the shooting. *Id.* at 38–41.

We do not set aside a factual finding of the Claims Court unless we determine that it is clearly erroneous, *i.e.*, unless we are left with "a definite and firm conviction that a mistake has been committed." *Pacific Gas & Electric Co. v. United States*, 668 F.3d 1346, 1350–51 (Fed. Cir. 2012) (cleaned up). We review the Claims Court's evidentiary determinations for an abuse of discretion, which is "found when (1) the [Claims Court's] decision is 'clearly unreasonable, arbitrary, or fanciful,' (2) the [Claims Court's] decision is 'based on an erroneous conclusion of the law,' (3) the [Claims Court's] findings are clearly erroneous, or (4) the record contains no evidence 'upon which the [Claims Court] rationally could have based its decision.'" *Zafer Taahhut Insaat v. Ticaret A.S.*, 833 F.3d 1356, 1365 (Fed. Cir. 2016) (quoting A*ir Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1341 (Fed. Cir. 1999). Applying those standards of review, we reject the challenges presented on appeal.

A

The Murray Family argues that the Claims Court's spoliation sanction for the destruction of the Hi-Point should be set aside as too lenient, at least as applied, because what was required was "an instruction that . . . the United States was liable for the death of Mr. Murray." Appellant Opening Br. at 45; *see id.* at 42–48. We disagree. The Claims Court did not abuse its discretion by imposing the particular sanction of an adverse inference, defined in scope and rebuttable in limited ways.

In our 2022 opinion, we indicated that an appropriate sanction could be "an adverse inference or inferences" regarding the Hi-Point, and we directed the Claims Court to evaluate whether the government should be prohibited from relying on secondary evidence relating to the

spoliated gun (*e.g.*, photographs and testimony). *Jones V*, at \*11. We explained that an appropriate sanction "(1) deter[s] parties from engaging in spoliation; (2) place[s] the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore[s] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* at \*9–10 (citation omitted and cleaned up). While a case-dispositive sanction may be necessary in some circumstances, we have explained that such a sanction "should not be imposed unless there is clear and convincing evidence of both bad-faith spoliation and prejudice to the opposing party." *Micron Technology, Inc. v. Rambus Inc.*, 645 F.3d 1311, 1328–29 (Fed. Cir. 2011). Bad faith requires more than a finding that the contested evidence was "'intentionally'" destroyed because "'bad faith' means destruction for the purpose of hiding adverse information." *Id.* at 1327 (citation omitted).

On remand, the Claims Court imposed a sanction on the government for spoliation of the Hi-Point through a "rebuttable adverse inference" that the handgun did not contain Mr. Murray's blood, tissue, fingerprints, or DNA. *Jones VI*, at \*21. The Claims Court permitted the government to rebut the inference through reliance on physical evidence or testimony from witnesses other than Officer Norton, and, if successful, the result would be no more favorable to the government than deeming to be simply unknowable what would have been found on the gun. *Id.* at \*22. And the Claims Court prohibited the government, in trying to meet its burden to rebut the adverse inference, from relying on contemporaneous photographs of the Hi-Point or other such secondary evidence. *Id.*

The Claims Court's sanction was consistent with our 2022 opinion and not otherwise an abuse of discretion. Although the Hi-Point would have been important evidence and its spoliation may have prejudiced the Murray Family's ability to recover (depending on what the handgun

would have revealed), the Claims Court reasonably found that the government acted only negligently when destroying the handgun, not in bad faith. *Micron*, 645 F.3d at 1327–28; *Jones VI*, at \*22–24. The FBI destroyed the Hi-Point pursuant to routine FBI procedures, in compliance with a court order, with public notice having been given, and with no request for preservation having been made. *Jones VI*, at \*23–24. The Claims Court reasonably found that a rebuttable adverse inference was better aligned with the degree of the FBI's culpability. *Id.* The Claims Court also reasonably determined that the sanction it adopted was an effective one and fits all the circumstances better than a case-dispositive sanction in other ways. It limited the evidence that the government could use for rebuttal, and it restricted the benefit to the government of successful rebuttal to a conclusion of unknowability, not a conclusion favorable to the government. *Id.* at \*24. And it in fact allowed the Murray Family to go to trial to try to establish liability with all the evidence still available. *See Jones VII*, at 580.

Additionally, we reject the Murray Family's challenge to the Claims Court's application of the spoliation sanction. The Claims Court complied with our remand instructions when it treated the DNA or fingerprints on the Hi-Point as simply unknowable and when it linked the Hi-Point to Mr. Murray through "the testimony of multiple officers, the transcript of transmissions to and from dispatch, and [the FBI's] investigation." *Jones VII*, at 613; *see id.* at 611–13. And the Claims Court reasonably relied on the absence of persuasive evidence that would connect the weapon to Officer Norton and support an inference that the handgun was planted near Mr. Murray. *Id.* at 612–13.

For those reasons, we conclude that the Claims Court did not abuse its discretion in either its formulation of the spoliation sanction or its application.

B

We similarly conclude that the Claims Court did not abuse its discretion in determining that Officer Norton's Glock and clothing were not spoliated. *Jones VI*, at \*33–41. "[A] party can only be sanctioned for destroying [relevant] evidence if it had a duty to preserve it" and "a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron*, 645 F.3d at 1320 (citation omitted). Here, consistent with our 2022 opinion, *Jones V*, at \*8, the Claims Court did not err in determining that the FBI did not have a duty to preserve the Glock and clothing.

The Claims Court reasonably found that there was no such duty because it was not sufficiently evident that a crime had occurred. *Jones VI*, at \*33–41. The Claims Court persuasively explained that the evidence (*e.g.*, the contemporaneous photograph of Officer Norton's clothing and the Police Chief's testimony about the condition of the Glock) corroborated the testimony of the FBI agent, who had arrived onsite that day; that the non-federal officers' attestations undercut any inference of criminal activity; and that no other evidence provided sufficient indications that Mr. Murray's gunshot wound was the result of criminal activity rather than a self-inflicted injury. *Jones VI*, at \*34–39. That is enough for us to affirm the Claims Court's ruling of no spoliation relating to the Glock and clothing without our having to reach the government's assertion that the Claims Court erred in finding sufficient foreseeability of litigation.

C

Finally, as to the ultimate non-liability determination, we conclude that the Claims Court did not clearly err in finding that the Murray Family failed to establish by a preponderance of the evidence that Officer Norton shot Mr. Murray. *See Jones VII*, at 613–22. The Murray Family has presented to us no ground for overturning that finding.

First, the Murray Family has not demonstrated that the Claims Court erroneously admitted the ownership history of the Hi-Point into evidence. *See* Appellant Opening Br. at 41–42. The record before the Claims Court reflects that the Murray Family stipulated to the admission of the handgun's ownership history. S. Appx. 291 (stipulating admission of pages 399–400 of the FBI agent's testimony, S. Appx. 207–208).

Second, the Murray Family has not presented a meritorious challenge to the Claims Court's reliance on the police dispatch transcript documenting the sighting of the "runner on foot in blue." The Claims Court's reliance on this transcript is not undermined, for purposes of setting aside the judgment before us, by evidence not admitted in the Claims Court (on which the Murray Family relies here) or by the Murray Family's arguments against the Claims Court's inference that Deputy Byron was the officer who reported seeing Mr. Murray. Appellant Opening Br. at 38–41 (citing an unadmitted deposition). The Claims Court carefully evaluated the physical evidence (*e.g.*, the location of both guns' shell casings and the fact that Mr. Murray was wearing a blue shirt) and the non-federal officers' testimony about their relative positions to find that the runner was Mr. Murray. *Jones VII*, at 593–96. The Claims Court reasonably relied on that evidence, together with the contextual inference that the relevant non-federal officers, who had viewed Officer Norton only a few minutes prior to the search, would likely have recognized him as the runner discussed in the dispatch transcript. *Jones VII*, at 593–95.

We have reviewed the extensive record evidence presented to us. Based on that review, we conclude that the Claims Court, which wrote a comprehensive and careful opinion, did not clearly err in finding that Officer Norton did not shoot Mr. Murray. *See Jones VII*, at 613–22. The court meticulously constructed a timeline of events, down to the level of minutes and seconds, of when the shooting could have occurred. *Id.* at 579–613. It reasonably found

that, given the mere ninety-second period from when Mr. Murray was last seen alive and when the shooting happened, there was no preponderance of evidence that Officer Norton shot Mr. Murray. The court appropriately considered the facts that Officer Norton was off-duty at the time of the chase and had no connection to either Mr. Murray or the Hi-Point and was thus unlikely to have prepared evidence to plant. *Id.* at 614–15. The court also reasonably considered that the nonfederal officers were generally no more than mere acquaintances, a fact tending to undercut any theory that they conspired to plant evidence or stage an elaborate cover-up. *Id.* at 612. Relatedly, the court reasonably pointed to Officer Norton's evident distress when he reported the shooting as suggesting that he was "unlikely to [have] invent[ed] and then implement[ed] a complicated story to explain the shooting in the limited time before other officers would arrive at the scene." *Id.* at 615. The record before us demonstrates no clear error in the Claims Court's finding of no liability in this case.

## III

We have considered the Murray Family's remaining arguments and find them meritless. For the reasons stated, we discern no reversible error in the rulings challenged on appeal, and we affirm the Claims Court's judgment.

The parties shall bear their own costs.

**AFFIRMED**